## TAYLOR *v.* GORDON.

Opinion delivered December 21, 1925.

1. PRINCIPAL AND AGENT—DEALINGS BETWEEN.—While an agent or trustee for the sale of property is not absolutely inhibited from purchasing the property himself, yet in an action by the principal or *cestui que trust* against the agent or trustee to set aside a transaction or to hold the agent or trustee to an accounting, the burden is on the agent or trustee to show that he acted in the utmost good faith.

2. PRINCIPAL AND AGENT—FINDING OF GOOD FAITH.—A finding by the chancellor that an agent met the burden of proving his good faith in purchasing an oil and gas lease from his principal *held* not clearly against the preponderance.

3. PRINCIPAL AND AGENT—GOOD FAITH OF AGENT.—The obligation of the agent to use good faith in buying an oil and gas lease from his principal is to be judged by the situation and the relation of the parties to each other, and not by subsequent events not known to either which caused the value of the lease to be greatly increased.

Appeal from Ouachita Chancery Court, First Division; *J. Y. Stevens,* Chancellor; affirmed.

*O. E. Westfall* and *G. R. Haynie,* for appellant.

*Gaughan & Sifford,* for appellee.

WOOD, J. This action was instituted by the appellant against the appellee to recover the sum of $5,000. The appellant alleged that on or about the 29th of May, 1922, the appellee induced the appellant to permit the appellee to handle and negotiate as appellant's agent the leasing of certain lands for oil and gas; that appellee insisted that he was in a position to negotiate said lands to the advantage of appellant in that he would be able to secure a higher price than the appellant would be able to do; that appellant and his wife, induced by these representations, executed to the appellee a lease on a certain tract of land in Ouachita County; that, after procuring this lease, appellee, on the 13th of October, 1922, with the further intention to defraud the appellant, executed and delivered a written assignment of the lease of the lands to one J. E. Gaughan, as trustee, naming as a consideration therein the sum of $25 per acre, when in

truth and fact the lease value of the lands at that time was $125 per acre, which the appellee well knew; that J. E. Gaughan never in fact purchased the lease, and did not pay any consideration therefor, and had no interest therein, and that such pretended assignment of the lease to him by the appellee was a fraudulent device to conceal from the appellant the true value of the lease, and to give the appellee an opportunity to sell and assign the lease for a much greater price than the pretended consideration mentioned in the assignment by the appellee to Gaughan; that the appellee falsely and fraudulently represented to the appellant that he had sold the lease described on appellant's land to J. E. Gaughan for the sum of $25 per acre, and that appellee settled with the appellant on that basis; that on November 28, 1922, appellee sold the oil and gas lease on appellant's land to one J. H. Snowden for $150 per acre, making a total sum of $6,000; that appellant had no means of knowing, and did not know, the appellee's fraudulent acts and conduct as above set forth in handling appellant's lands until long after appellee had finally assigned the lease to Snowden. The appellant prayed judgment against the appellee in the sum of $5,000, the difference between the amount for which the appellee assigned the lands to Snowden and the amount paid by appellee to appellant.

Appellee, in his answer, admitted that the appellant was the owner of the lands described in the complaint, but denied that he had induced the appellant and his wife to execute to him a written lease on the lands with the intent to cheat and defraud the appellant, and denied that he executed a lease to Gaughan as trustee with the intention to cheat and defraud the appellant. He denied that the execution of the assignment by the appellee to Gaughan as trustee, and the consideration named therein, was a fraudulent device or subterfuge employed by the appellee to deceive the appellant and conceal from him the true value of the lease. He denied specifically the allegations of fraud set up in the complaint, and alleged

in substance that the appellant was a negro and unfamiliar with business practices and values of lands or oil and gas leases, and requested the appellee to assist him in disposing of the oil and gas lease on appellant's land. To this appellee consented, and, in order to enable appellee to handle the lands to better advantage, appellee requested the appellant to execute an oil and gas lease covering the lands described to the appellee, which the appellant did; that on or about the 13th of October the appellant stated to the appellee that he (appellant) could get $10 or $15 per acre for his lease and wanted appellee to sell it at that price; that appellee then told the appellant that the lease was worth more than $10 or $15 per acre, and that he (appellee) would give appellant as much as $25 per acre for the lease, which at that time was a fair price for the same; that the appellant accepted the offer; that other parties were interested with the appellee in the purchase, and for convenience it was agreed that title should be conveyed to Gaughan as trustee for the benefit of the appellee and the other parties associated with him in the purchase; that, since the sale of the oil and gas lease to the appellee, oil had been discovered on the land adjoining the territory in which the land of the appellant was situated, causing the price of oil and gas leases to greatly increase in value, and that it was because of this fact that the appellant became dissatisfied and instituted this action.

The appellant testified in substance that he had known the appellee for eighteen years; that he executed to him a lease on 40 acres of land on May 29, 1922. Appellant didn't know anything about oil and gas leases, and had confidence in the appellee. Appellee had promised to help appellant out in handling his oil and gas leases. Appellant therefore made the appellee his trustee and agent to sell the lease on his land. Appellant received $1,000 for the lease which the appellee later sold to Snowden and McSwinney. On the 13th of October, 1922, appellee sent word to appellant to come to town, and on the 14th of October appellant went to Camden and appel-

lee gave him $1,000, and stated that the lease had been
sold. In the conversation appellee stated to appellant
that he was not charging appellant for his services, but
would like to have a little piece of royalty. Appellant
thought one good turn deserved another, and agreed to
let the appellee have half of the royalty on 20 acres, for
which the appellee paid $125. It was worth more than
that, but appellant thought that appellee had been looking
out attending to the sale of the lease for him, and on that
account he let appellant have the royalty at a reduced
price. Appellee did not tell the appellant at that time the
name of the party to whom he had sold the lease. Appel-
lant asked appellee who was going to pay the rental if
they did not drill the land, and appellee replied, "The
other fellow," but did not say who the other fellow was,
and appellant did not know to whom the appellee had sold
the lease until he obtained the second abstract. Just
before appellee paid the appellant $1,000, leases were
being sold on lands further from production than appel-
lant's land for $30 per acre, and on land a half mile
nearer at $40 per acre. Appellant never offered to sell
the land for $10 or $15 per acre, and after he turned the
lease over to the appellee, and before appellee paid him
the $1,000, appellant had been offered from $22 to $30 per
acre, and he told the persons making the offers that he
would not sell it for $1,000 per acre unless the party
would make arrangements with appellee to buy, as he
(appellant) had turned the handling of his lease over to
the appellee. After he turned the lease over to the appel-
lee, he referred all persons to him, as he understood that
he had made the appellee his agent to sell the lease, and
he expected to pay the appellee for his trouble. Appellant
testified that the appellee never told him that he would
give him $25 an acre for the lease if appellant was will-
ing to take it, if appellee could get others to take part
of it. A man by the name of Sutton had offered appel-
lant $25 an acre with a ninety-day drilling contract, and
appellant told Sutton that he had placed his lease in
appellee's hands, and at Sutton's request gave Sutton an

order to appellee for the purchase of the lease at $25 an acre with a drilling contract. One or two days after appellant had signed the order for Sutton, the appellant and his wife came to town and received the payment from the appellee for the lease. Appellant at that time did not tell the appellee about Sutton's offer, as it was then too late. The appellant testified that he was not posted on the value of oil and gas leases, as he had turned the same over to the appellee. Twenty-five dollars an acre was not a fair price for the lease at the time appellant sold the same to the appellee. Some time after the appellant received the $1,000 from the appellee he ascertained from the new abstract that the appellee had sold the lease for $6,000. Appellant had no knowledge of who was buying the lease, as he was fifteen miles from Camden when the lease was sold. He did not ask the appellee the name of the man who purchased the lease. The man who came out with the paper for appellant to sign told appellant that he (appellant) was not leasing, but was just giving the appellee permission to lease same for the appellant. Appellant took his word for it, and what he signed might have been a lease. At the time the money was paid, appellant did not ask the appellee for the lease that he might sign it.

There was testimony on behalf of the appellant to the effect that about the time, on the 13th of October, 1922, some leases were selling on lands adjoining the Taylor tract at $30 per acre. These leases were about two miles from the Pat Marr well, which was producing oil. One of the witnesses testified that at that time he considered appellant's lease worth from thirty to thirty-five dollars per acre. This witness stated that he was willing to pay that much money on the consideration of the fact that a well was to be drilled in that vicinity; that but for that fact the lease would not have been worth that much money. They had a speculative value on account of the location of the well to be drilled in that vicinity. One of the witnesses stated that he offered appellant $35 per acre for his lease, and that appellant

declined to take it.    The witness did not know whether the
Pat Marr well came in before the 13th or 14th of October
or not.

Witness Patton testified for the appellant to the
effect that he had sold a lease on a forty-acre tract in
the neighborhood for $255, and on another forty for $235.
He sold a lease on one forty about a mile from appel-
lant's after the Pat Marr well came in.    The lease on the
land in controversy in witness' opinion did not have any
value to witness on the 13th of October.    The buyers were
grabbing what they could get.    It was shown that the
Pat Marr well in that vicinity began to make oil on the
12th of October, 1922.

A. M. Sutton testified for the appellee, to the effect
that he was instrumental in blocking up the acreage and
securing the drilling of the used well in the same section
in which the land owned by appellant was located.    On
October 13, 1922, he tried to buy the lease on appellant's
land.    The Pat Marr well had not come in at that time.
Witness paid Mrs. Hughes $12.50 per acre for 460 acres,
and Sam McElroy $30 per acre for 20 acres that joined
appellant's land on the north.    He offered appellant $25
an acre, which was satisfactory to appellant, and had
written an order authorizing the appellee to assign the
lease to witness, which the appellant signed.    Witness
made an agreement with the appellant to start a well
within ninety days, or pay him $1 an acre.    About that
time $25 was the average per acre for leases in that vicin-
ity.    Witness was familiar with the values of land, and
what was being paid for leases in that territory, and
before witness went in there leases had not sold for any-
thing like $25 per acre.    Ten dollars per acre would have
been a fair price before witness began talking about
drilling on the Hughes land.    Witness presented the
order signed by the appellant to appellee on the next day
after same was signed, and appellee told witness that he
had sold the lease two hours before.    Appellee asked wit-
ness what he was giving, and appellee told witness that
that was what he had received for it.    The order signed

by the appellant instructed the appellee to make an assignment of the lease to witness for $25 an acre. The Pat Marr well in that vicinity had not come in at that time. When that well came in, after the 13th of October, it had a material effect in figuring the value of the leases in that vicinity. The witness further testified that the agreement he had with the appellant was that he would drill on appellant's tract, and would give appellant $25 an acre, and begin drilling within ninety days, or pay rental from the date of the lease. Appellant wanted to sell the lease for $25 an acre, and stated to witness that he was sure it would be all right with the appellee to let witness have the lease, and gave witness the order to appellee to that effect.

Witness Campbell testified for the appellee that on the 13th of October, 1922, he paid $500 for a half interest in the lease of appellant's land for himself and Ursery. The appellee was also interested in the purchase. The lease was in the name of Gaughan, trustee, to whom it had been assigned by the appellee, as trustee. This lease was sold about six weeks later to Snowden and McSwinney. At the time witness purchased the interest for himself and Ursery, he was not aware of any unusual or added value to the property on account of the Pat Marr well coming in after he purchased the interest. Witness was interested with the appellee in the purchase of oil and gas leases. The lease was assigned to Gaughan as trustee for convenience. There was no understanding between the witness, appellee and Ursery that witness would refund to appellee the amount witness received on sale of the lease if appellee should lose the suit. But if appellee should lose the suit, witness would refund the money. Witness had no knowledge that the purchase of the lease from the appellant was not satisfactory. The $500 paid by witness represented the half interest of himself and Ursery in the lease.

Appellee testified in substance that he was in the mercantile supply business in October, 1922, at Camden and

also working actively in the Ouachita Valley Bank as vice president. The appellant had been trading with the appellee for several years. Appellee had extended appellant credit when he did not have the money to pay for supplies. Appellant turned the lease in controversy over to witness to try to sell for him. Witness finally bought the lease from the appellant himself on October 12, 1922. Appellant told the appellee that he thought the lease was worth $25 an acre, as that was what was being paid for leases in that neighborhood, and stated that he was willing to take that for his forty. Appellee stated to appellant that he didn't want to gamble that much on it himself, but would get some one else to go in with him and take part of it, and that appellee would pay that much for it. Appellant replied that it didn't make any difference to him, so he got the money. On the next day, October 13th, appellee sent word to appellant to come to town. Appellee had made arrangements with Campbell and Ursery to go in with him to purchase the lease. They deposited the money with the witness at the store to appellant's credit. On the 14th appellant came in answer to appellee's message. Appellee gave appellant his check for $898.93 in payment for the lease, which was the amount left of the $1,000 after deducting appellant's account with the appellee at the store. Appellant agreed with the appellee that he wanted to sell it, and was willing to take $25 per acre for it. On the 13th of October, 1922, appellee received a note from the appellant to the effect that Sutton had offered him $25 per acre, and asking appellee, if he had not already made any disposition of it, to sell it to Sutton for the same price he had agreed with appellee to take for it. There was nothing in the note appellee received in regard to a drilling proposition. The note simply said that Sutton was willing to pay $25 per acre. When appellee decided to purchase the lease, he assigned it to J. E. Gaughan as trustee, who was to hold the title for the appellee, and his associates. This was for convenience, because the lease from appellant to the

appellee was in appellee's name. After the transaction was completed, the appellee gave the appellant $125 for a half royalty in 20 acres, which was the amount the appellant asked and was a fair price. Witness sold the lease to Snowden and McSwinney six weeks after he purchased it from the appellant. In the meantime the Pat Marr well had come in, which made the lease more valuable than it was when appellee purchased it. At the time appellee purchased the lease he knew of no development or production in that section.

The appellee testified that the reason appellant turned the sale of the lease over to him was that the appellant was going to try to handle it where he lived, and appellee was going to try to handle it from where appellee lived. Appellee made the suggestion to appellant. He wanted to help the appellant sell the lease so appellant could pay what he owed the appellee. Appellee was handling the lease as best he could for the appellant. Campbell was employed by the appellee in the appellee's store, and Ursery was appellee's brother-in-law. Witness had no written contract with Campbell or Ursery about their interest in the lease. He didn't know about the 12th, 13th and 14th of October that there was a considerable scramble among lease buyers to get lands in the neighborhood of the lands involved in this suit. On the 12th of October appellant had told the appellee that if appellee could get $25 per acre in cash, and not bind the land up in an escrow agreement, to sell it. Appellee simply told appellant that, if he could find somebody to join with him in the purchase at that price, appellee would take it himself. Appellant said, "All right; that is what I want for it, and if you can get the money let me know." The purpose in assigning the lease to Mr. Gaughan as trustee was for convenience and to close the relation appellee had in it with the appellant, and for the protection of the different interests. The reason appellee had the title to the lease put in his name was to enable appellee to sell it quicker, and easier than to go out to appellant's house,

and get the lease signed from appellant and his wife. Witness stated that he didn't think that appellant asked him on the 13th of October to whom the lease had been sold other than himself. The purchase money was paid to appellee by the parties interested with him in the purchase on the 13th of October, 1922, and the assignment to Gaughan as trustee was made on the same day.

Several witnesses testified on behalf of the appellee to the effect that $25 an acre was a fair price for the lease in controversy at the time same was sold to the appellee and his associates, and that $125 for a half royalty in 20 acres was a fair price for that royalty at that time.

One witness by the name of Lide testified for the appellee that he was engaged in the oil and gas lease business and insurance business, and was familiar with the conditions in the Smackover field in October, 1922. He considered $25 an acre cash for a lease on appellant's land a fair price at that time. Leases in that vicinity had brought anywhere from thirty to thirty-five dollars an acre, and further south brought as high as $55 an acre. Witness thought that $25 was a fair value for the lease in controversy.

Appellant and another witness for him testified in rebuttal of some of the statements of the appellee.

The trial court found generally in favor of the appellee and entered a decree dismissing the appellant's complaint for want of equity, from which is this appeal.

The law applicable to cases of this kind is well stated by Mr. Justice FRAUENTHAL, speaking for this court, in the case of *American Mortgage Company* v. *Williams,* 103 Ark. 484, at page 497, as follows: "The principle, we think, is well settled that a trustee or one who occupies a relation of confidence in the management or sale of property can not deal with it in any manner for his own benefit. This doctrine applies to the relation of principal and agent with reference to property which is the subject of the agency. It is uniformly held that 'no one can be per-

mitted to purchase an interest where he has a duty to perform that is inconsistent with the character of a purchaser.' Where an agent who is intrusted with the sale of property purchases it himself without disclosing the fact that he is the purchaser to the owner, the sale will be canceled in a court of equity at the instance of such owner. *Boysen* v. *Robertson*, 70 Ark. 56; *Thweatt* v. *Freeman*, 73 Ark. 576; *Bank of Pine Bluff* v. *Levi*, 90 Ark. 166. But such purchases are not absolutely void; they are only voidable. If the transaction is made in perfect fairness, and if disclosure is made to the owner that the agent is the purchaser, and with such knowledge the owner agrees to or ratifies such sale, then equity will not avoid and cancel same. Under such circumstances, the agent is not precluded from buying property placed in his hands for sale.''

In the case of *Thweatt* v. *Freeman, supra,* cited by Judge FRAUENTHAL, speaking of the confidential transaction between an attorney and client in which the attorney was intrusted with the handling of certain personal property and real estate belonging to his client, and which was afterwards acquired by the attorney, we said: ''But the burden of establishing its perfect fairness, adequacy, and equity is thrown upon the attorney, upon the general rule that he who bargains in a matter of advantage with a person placing a confidence in him is bound to show that a reasonable use has been made of that confidence; a rule applying equally to all persons standing in confidential relations with each other.'' (Story's Eq. Jur. § 311). While a trustee or agent for the sale of property is not absolutely inhibited from the purchase of the property himself, yet in an action by the *cestui que trust* or the principal against the trustee or agent to set aside the transaction or to hold the trustee or agent to an accounting, the burden is upon the trustee or agent to show that he acted in the utmost good faith. That is, the trustee or agent must show he used no undue influence and took no advantage of the confidential relation to bring

about a sale to himself of the property with which he was intrusted. He must show that he put the party to whom he stood in a confidential relation in possession of all the facts within his knowledge to enable the party who intrusted him to act understandingly and freely. In other words, the transaction, to use the apt language quoted by us in *Thweatt* v. *Freeman, supra,* "must be *uberrima fides*"; and the burden is on the trustee or agent occupying the confidential relation to show that the transaction was in the utmost good faith; otherwise, a court of equity will set it aside. Numerous cases of this court are cited in *American Mortgage Co.* v. *Williams* and *Thweatt* v. *Freeman, supra,* where the above doctrine is announced. Therefore, there can be no doubt about the law applicable to the facts of this record. It is conceded by the appellee that he was the trustee or agent of the appellant to sell the oil and gas lease which the appellee and his associates purchased. Therefore, the only question of serious character in the case has been to determine under the evidence whether or not the appellee has met the burden which the law requires of him to prove that the transaction by which he and his associates acquired the oil and gas lease from the appellant was conducted and consummated in the utmost good faith on the appellee's part.

This is purely a question of fact, and we have set out the above salient features of the testimony bearing upon that issue, and do not believe it would subserve any good purpose to restate or argue them at length in giving the reasons for the conclusion we have reached. Suffice it to say, we are convinced that the finding of the chancellor is not clearly against the preponderance of the evidence. The testimony on behalf of the appellee tends to prove that, before the purchase was consummated by him for himself and his associates, he let the appellant know that he himself would purchase the land, and give appellant $25 an acre for the same if he could get some one to go in with him. A preponderance of the evidence shows that

$25 an acre was a fair price for the lease at that time, and that appellee was not cognizant of any facts at the time the sale was made that would justify him in believing that the lease was of greater value or that appellant could obtain more for it. The testimony of A. M. Sutton, who was a witness for both the appellant and the appellee, was to the effect that the average value of leases in the vicinity of appellant's land at that time was $25; that witness had offered appellant that price for his land, and that the price was satisfactory to appellant, and appellant signed an order to the appellee to that effect. Another witness, by the name of Lide, testified that $25 an acre cash was a fair price for the lease at that time. At that time the Pat Marr well had not come in. After it came in the price of leases in that vicinity advanced very rapidly. The testimony of appellant himself tends to prove that at the time the sale was made to the appellee he considered $25 an acre a fair price for his land, but he thought at that time that the appellee had really sold the lease and received a greater price for it, and was not paying the appellant the price he had received. This is indicated by the testimony of appellant when he says that the trade would have been all right if the appellee had given appellant what was coming to him; that appellant thought at the time the appellee settled with him that the appellee had received more money for the lease than he was giving appellant. Notwithstanding appellant so thought, he did not so inform the appellee, and express any dissatisfaction with the settlement. Indeed, the testimony of the appellant tends strongly to show that his dissatisfaction with the settlement was brought about after he discovered from the abstract that the appellee had sold the lease for $6,000, and had only accounted to appellant for $1,000 or at the rate of $25 an acre. But, as before stated, a preponderance of the evidence shows that $25 an acre at the time the sale was consummated was a fair price. Of course, the duties and obligations of the appellee to the appellant must be judged by the situation of the parties and their

relation to each other at that time, and not by the subsequent events unknown to both which caused the price of leases in that vicinity to soar skyward in so short a time.

After a careful consideration of all the testimony in the record, we cannot say that the general findings of law and fact by the chancellor in favor of the appellee are erroneous. The decree is therefore affirmed.